Filed 6/9/25  P. v. Coronado CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAVIER BETENCOURT CORONADO,<br><br>    Defendant and Appellant. | H050847<br>(Santa Clara County<br>Super. Ct. No. C2104995) |

A jury convicted Javier Betencourt Coronado of lewd or lascivious acts against two minors under the age of 14 by force or fear (Pen. Code, § 288, subd. (b)(1)).[1]  On appeal, Coronado argues for reversal based on the admission of evidence of his alcohol use, the prosecutor's misstatement of that evidence in closing argument, the trial court's admission of expert testimony on child sexual abuse accommodation syndrome (CSAAS), and jury instruction on the limited use of CSAAS evidence.  Finding no reversible error in Coronado's appellate claims, we affirm.

## I.    BACKGROUND

The Santa Clara County District Attorney charged Coronado in 2022 with five counts of lewd or lascivious acts on a person under the age of 14 by force or fear (§ 288,

___

[1] Unspecified statutory references are to the Penal Code.

subd. (b)(1); counts 1–5) and two counts of lewd or lascivious acts on a child under the age of 14 (§ 288, subd. (a); counts 6 & 7). Count 1 was alleged to have been committed against victim S.D. between 2013 and 2016, and counts 2 through 7 were alleged to have been committed against victim O.D. between 2014 and 2019. As to all counts, enhancements were alleged under the One Strike law. (§ 667.61, subd. (j)(2).) It was also alleged that Coronado had a prior conviction that qualified as both a prior strike and a prior serious felony. (§§ 1170.12, 667, subd. (a)(1).)[2]

A.     *The Prosecution's Case*

  1.     *S.D.*

S.D. (born in 2005) has several siblings, including younger sister O.D. Coronado was married to S.D.'s aunt R.C., and S.D.'s family used to live next door to them. S.D.'s parents worked the graveyard shift, leaving for work around 9:00 p.m. and returning around 1:00 in the morning; S.D. and O.D. would stay with Coronado and R.C. while their parents worked. At times, S.D. went to R.C.'s house to help with R.C.'s dog sitting service.

Coronado touched S.D. inappropriately when she was eight years old and in third grade. Her parents at work, S.D. had spent the day with R.C. and Coronado. When S.D. was outside near the side of the house, Coronado put his hands underneath her shirt, touching her chest and pinching her nipples. S.D. did not think she could have to stopped him: He was her father's best friend, and she did not want her parents to be mad at her.

S.D. was also afraid and did not want to ruin any family relationships, so she said nothing. It was not until several years later, in March 2021, that S.D. told her mother D.M. about Coronado's abuse.

---

[2] The information also alleged several circumstances in aggravation, including that Coronado took advantage of a position of trust or confidence to commit the offense (Cal. Rules of Court, rule 4.421(a)(11)), that he had prior criminal convictions that are numerous or of increasing seriousness (*id.*, rule 4.421(b)(2)), and that he had served a prior prison term (*id.*, rule 4.421(b)(3)).

2

**2.** *O.D.*

O.D. (born in 2007) saw R.C. and Coronado frequently as a child; she sometimes helped R.C. watch her dogs. Coronado touched O.D. inappropriately four times when she was in the third grade.

The first time, Coronado told O.D. that he had a surprise for her in his front pants pocket. When she reached into his pocket, she felt only his erect penis and tried to withdraw her hand. But he grasped her wrist and pushed her hand back into his pocket, holding it against his penis for what felt like longer than a minute.

The second time, O.D. was at Coronado's house watching television with her brother in their cousin's room when Coronado joined them. O.D. believed that Coronado was "probably drinking" before he came into the room. Coronado sat next to O.D. on the bed, covered her legs and his with a blanket, and started touching her. Coronado rubbed O.D.'s thighs and vagina over her clothes, hard enough that it hurt her. O.D. said nothing to her brother, who was sitting apart from them in a chair.

The third time, O.D. was in the backyard after dark to let the dogs out. Coronado was there and picked her up rubbing her vagina under her nightgown and over her underwear. He told her, "Next time don't wear underwear."

The fourth time, O.D. went to Coronado's house to watch R.C.'s dogs. O.D. was fearful because of the earlier incidents, but she went because R.C. paid her $5 to watch the dogs, and O.D. liked animals. After using the basement bathroom, O.D. came out and saw Coronado on the couch. O.D. lay down on the couch and Coronado rubbed his hand on her leg. Coronado then touched O.D.'s vagina over her jeans and rubbed her for a while.

In March 2021, after S.D. disclosed her own experience of Coronado's abuse, O.D. told her mother what happened. Until then, O.D. had told no one of the abuse out of embarrassment.

3

### 3.     *O.D. and S.D.'s Parents*

In March 2021, after S.D. and O.D. told D.M. about their abuse, D.M. told her husband E.M. and her friend M.P. M.P. reported the abuse to the police. D.M. recalled having moved next door to R.C. and Coronado in 2015 or 2016.[3] The two families were close, visiting often. E.M. did not notice any changes in O.D. or S.D.'s behaviors around Coronado. But when S.D. was around 15 years old, D.M. noticed that she seemed less willing to spend time with Coronado and R.C.

### 4.     *CSAAS*

Psychologist Anna Washington testified as an expert in CSAAS, which she described as an "educational framework" to counter common myths or misconceptions about sexual abuse victims.

CSAAS has five components, not all of which are present in every case. The first component, secrecy, relates to how a perpetrator may have private access to a child and ensure that the child tells no one about the abuse. The second component, helplessness, addresses the myth that children will report abuse or resist a perpetrator: The perpetrator might be a caregiver, and typically has a physical advantage over the child victim. The third component, entrapment and accommodation, relates to children's coping strategies to deal with the abuse. The fourth component, delayed, conflicted, and unconvincing disclosures, responds to the myth that children will report abuse right away: Children tend to delay disclosures, especially when they have a closer relationship to the perpetrator. The fifth component, recantation, relates to a child's withdrawal of a previous true disclosure of abuse.

---

[3] Born in 2005 and 2007, respectively, S.D. and O.D. would have been in third grade around 2013 and 2015. We acknowledge that the offense year that S.D. reported predated what her mother reported as the year they moved next door to Coronado and R.C.

**B.** *The Defense[4]*

### 1. *Coronado*

Coronado denied ever babysitting O.D. or S.D. He also denied spending time with O.D. watching R.C.'s dogs or spending time with O.D. or S.D. inside his house. In 2016, Coronado was injured at work when he slipped off a ladder. Because of his injury, Coronado stopped working and could not lift heavy objects—the maximum weight he could carry was around 10 or 15 pounds.

On cross-examination, Coronado testified that he believed his memory of his post-work life was fairly clear but acknowledged that he consumed alcohol almost daily. He drank from 3:00 or 4:00 p.m. until around 7:00 or 8:00 p.m. but did not believe alcohol affected his memory. He typically only had a few beers before dinner. But he entered a treatment program for alcohol abuse in 2015 or 2016.

### 2. *R.C.*

R.C. and Coronado married in 1991 and had two children, both now adults. At the time of the alleged offenses, Coronado and R.C. lived in the bottom portion of the house and R.C.'s parents and another sister lived on the top. In 2016, D.M. and her family moved in next door. According to R.C., D.M.'s "kids [were] always coming over jumping around their uncle."

Coronado's back and ankle injuries in 2015 and 2016 caused him to stop work in 2016. He was often bedridden. R.C. started her dog-sitting business in March 2017 and hired O.D. to help watch the dogs in the summer of 2018. O.D. helped with the dogs only twice when R.C. was away, and both times Coronado was with E.M. next door.

---

[4] After presenting his case-in-chief, the prosecutor moved to dismiss counts 6 and 7 due to insufficiency of the evidence, which the trial court granted. Coronado also waived his right to a jury trial on the circumstances in aggravation and the allegation that there were multiple victims.

R.C. was able to watch O.D. on home surveillance cameras, which R.C. had installed in every room.

D.M. first asked R.C. to babysit O.D. in the summer of 2016, and after that summer never asked D.M. to babysit O.D. again. R.C. never babysat S.D. when S.D. was in elementary school. Although O.D. would come to R.C.'s house, it was typically to play with the dogs outside. On these visits, O.D. would occasionally come into R.C.'s part of the house but would only stay for a few minutes.

**C.** *The Prosecution's Rebuttal*

Coronado's son, J.C., lived with his parents between 2010 and 2019. O.D. and S.D. sometimes came over to help with the dogs or to spend time with J.C. and his sister. J.C. graduated high school in 2015, and when he was in high school and college, he recalled that Coronado drank alcohol starting in the morning. Coronado would drink "a lot of alcohol spaced out" over time, and drinking changed Coronado's demeanor. When sober, Coronado was mild-tempered and easy to talk to; when drinking, however, "you need[ed] to walk on eggshells" to avoid upsetting him. J.C. once saw his father either "passed out or being incoherent" due to alcohol in 2017 or 2018, but this incident did not take place at home. Coronado had cirrhosis of the liver, and the associated strong odor caused his parents to sleep apart. J.C. first noticed the odor in 2013 or 2014 and attributed the cirrhosis to Coronado's alcohol abuse.

**D.** *The Verdict and Sentencing*

In December 2022, the jury found Coronado guilty of counts 1 through 5. On Coronado's jury waiver as to sentencing allegations, the trial court found not true the allegations that Coronado had a prior serious felony conviction and that his prior convictions were either numerous or of increasing seriousness but found true the aggravating factors that Coronado was in a position of trust and abused more than one victim.

6

In March 2023, the trial court sentenced Coronado to a total term of 125 years to life, composed of five consecutive terms of 25 years to life for each count, under the One Strike law.

## II. DISCUSSION

### A. *Admission of Evidence of Coronado's Alcohol Consumption*

Coronado argues that the evidence of his alcohol consumption was inflammatory and irrelevant and should have been excluded under Evidence Code section 352.  But the nature of Coronado's testimony—his unequivocal testimony that he never, including in the years spanned by S.D.'s and O.D.'s allegations, touched either girl inappropriately— permitted the prosecution to inquire about conditions or conduct that could reasonably have impaired the reliability of his perception and memory for the time about which he testified.  And when his responses about his alcohol use materially differed from what the prosecution knew it could prove, the prosecution was entitled to impeach his veracity. We discern no abuse of discretion in the trial court's admission of this evidence.

#### 1. *Additional Background*

In limine, the trial court granted Coronado's motion to exclude references to his alcohol use as "equivalent to bad character" and irrelevant to the charged offenses.[5] Under Evidence Code section 352, the court instructed the prosecutor to "caution his witnesses not to characterize the defendant as an alcoholic or a heavy drinker."  But the court noted then "that . . . if [a] victim recalls him . . . slurring or being drunk in her opinion," such evidence would be admissible.

During trial, in anticipation of Coronado's testimony, defense counsel requested that questions pertaining to Coronado's drinking be excluded under Evidence Code sections 350 and 352, though defense counsel was "not objecting to asking [Coronado]

---

[5] Though raised below, Coronado does not argue here on appeal that evidence of his alcohol consumption was improper character evidence under Evidence Code section 1101.

specifically on a particular day about alcohol consumption and his memory on that day." The trial court determined that alcohol use could be relevant to Coronado's ability to perceive and recall events but that questions on this point should be framed as "to specific time, times, or time periods that would make them relevant to his ability to perceive events that are at issue in this case."

On cross-examination, after Coronado denied ever having touched the girls inappropriately, the prosecutor asked Coronado if his memory of the years after he stopped working was clear, then asked Coronado if he drank alcohol; the defense did not object to any lack of specificity in the time frame. After Coronado answered yes, the prosecutor asked Coronado if, once he stopped working, he "start[ed] pretty early with the beers." Coronado demurred, saying "Well, 3:00 [o']clock, 4:00 o'clock," and defense counsel objected, renewing his motion in limine. The trial court overruled the objection. Coronado denied that his alcohol use ever impaired his memory; asked if he ever forgot things "after a night or day or drinking," Coronado replied, "No[,] I never drank too much." But the court later struck from evidence Coronado's reference to having a prior DUI conviction.

When J.C. was called as a rebuttal witness, the trial court overruled a defense objection (again citing the motion in limine) to the prosecutor's asking about Coronado's drinking. After J.C. testified that his father "dr[ank] during [the] time" that J.C. lived with his parents, defense counsel objected on vagueness grounds because this was a period of nearly 10 years. The trial court overruled the objection, and the prosecutor asked J.C. if his father usually drank only three or four beers in the afternoon before dinner. The trial court overruled a defense objection on relevance grounds. J.C. testified that his father drank more than that.

When J.C. was asked about his father's drinking pattern, the trial court responded to a defense objection about the vagueness as to time by instructing the prosecutor to ask about a more specific period; J.C. testified that he was talking about the period during

8

and after high school when he had to get up early for work in the morning. During these early morning periods, J.C. would see his father start to drink in the mornings. When the prosecutor asked J.C. how he would characterize his father's level of alcohol consumption, defense counsel objected on relevance grounds and his motion in limine, which the trial court overruled. J.C. replied that his father consumed "a lot of alcohol spaced out" over a given day.

**2.    *Analysis[6]***

We review the trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1198.) Relevant evidence includes "evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) But relevant evidence is subject to exclusion under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Undue prejudice, however, means more than a likelihood of " 'undermin[ing] the opponent's position or shor[ing] up that of the proponent.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438 (*Doolin*).) Evidence is unduly prejudicial when it tends "to evoke an emotional bias against a party because of extraneous factors unrelated to the issues." (*People v. Cortez*

---

[6] Coronado alternatively argues that if we were to find that defense counsel did not sufficiently object to the alcohol evidence, counsel rendered ineffective assistance. But given that defense counsel raised the issue of the relevance and the potential prejudicial impact of the evidence prior to trial in a motion in limine and again made multiple objections when both Coronado and J.C. testified about Coronado's drinking habits, we find that Coronado's challenge to the admission of the evidence under Evidence Code section 352 has not been forfeited. (Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 433–434 (*Partida*) [discussing requirement of a timely and specific objection to evidence].)

9

(2016) 63 Cal.4th 101, 128.) " '[W]hen [evidence] is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction,' " " 'the substantial likelihood the jury will use it for an illegitimate purpose' " makes the evidence " 'unduly prejudicial.' " (*Doolin*, at p. 439.)

We find no abuse of discretion in the trial court's admission of the evidence as relevant to Coronado's ability to recall events. When evaluating the testimony of a witness, the jury is entitled to consider "[t]he extent of [the witness's] capacity to perceive, to recollect, or to communicate any matter about which he testifies." (Evid. Code, § 780, subd. (c).)[7] We thus find no abuse of discretion in the trial court's ruling that evidence of Coronado's ability to recall the events was relevant, rendering his alcohol use similarly relevant.

Although neither S.D. nor O.D. testified that Coronado appeared inebriated during the offense conduct, J.C.'s testimony about Coronado's alcohol consumption encompassed each girl's third-grade year (approximately 2013 and 2015)—the year each reported that Coronado abused them. (See *People v. Panah* (2005) 35 Cal.4th 395, 478 [evidence of witness's drug use inadmissible unless testimony shows that witness was under the influence when testifying, when the facts to which he is testifying occurred, or that mental faculties were impaired by narcotics].) And though Coronado suggests that the testimony of O.D. and S.D. shows that he could not have been under the influence of

---

[7] As context for his denial of wrongdoing, Coronado testified on direct examination about his "typical day-to-day life" during the time that S.D. and O.D. lived next door. Although this alone would not make habitual alcohol abuse relevant, the prosecutor tethered his cross-examination about Coronado's drinking habits to Coronado's ability to recall events of that period. "A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1147.) J.C. was called by the prosecution to rebut Coronado's testimony about the limited scope of his drinking, and "the scope of rebuttal lies within the trial court's discretion." (*People v. Friend* (2009) 47 Cal.4th 1, 87.)

10

alcohol for the instances of sexual abuse they described, we disagree. Drawing all inferences in favor of the judgment, as we must, we cannot construe their mere silence on symptoms of intoxication as evidence of sobriety, absence of evidence not being evidence of absence. Rather, consistent with their young age at the time of the events recounted, we understand that they were focused on their own experience of the events and not on assessing Coronado's.[8] Even though there was no direct evidence that Coronado was drinking before or during the alleged events, "the fact that the evidence was not conclusive on this point did not negate its probative value." (*People v. Wright* (1985) 39 Cal.3d 576, 583–584.)

In *People v. Balderas* (1985) 41 Cal.3d 144, the California Supreme Court found no error in precluding the defense from questioning a witness to the defendant's incriminating statements about his use of narcotics at the defendant's home on other days. (*Id.* at p. 191.) The high court rejected the defendant's contention that "evidence of habitual narcotics use would have impeached [the witness's] *general* recall and perceptive abilities" observing that "[e]vidence of habitual narcotics or alcohol use is not admissible to impeach perception or memory unless there is expert testimony on the probable effect of such use on those faculties." (*Ibid.*, italics added; see also *People v. Wilson* (2008) 44 Cal.4th 758, 794 [citing to *Balderas* with approval]; Evid. Code, § 801, subd. (a) [expert testimony admissible on matters that are "sufficiently beyond common experience" that can reasonably assist a trier of fact].) But *Balderas* involved the inference that past narcotics use on specified occasions might impact a witness's *general* ability to perceive and recall a different occasion when the witness was not under the influence.

---

[8] Certainly, nothing in the girls' testimony entitled the prosecution to introduce evidence of Coronado's alcohol usage in its case-in-chief. But the trial court properly excluded the evidence until Coronado's cross-examination.

11

We do not read *Balderas* as holding that expert testimony is necessary for the more rudimentary proposition that intoxication, habitual or otherwise, may impair one's ability to recall and perceive events concurrent with that state of intoxication. Here, the theory of impeachment was not that Coronado was so habitually drunk that his general recall and perceptive abilities were impaired even as to events that occurred when he was sober; the theory was that he was drunk often enough to make less reliable his testimony that he had a clear memory of the years at issue and *never* engaged in the charged conduct at any point in those years. The possible impacts of excessive alcohol use on a person's memory are, unlike the impacts of other intoxicants, something that is within a juror's common experience. (Compare *People v. Cox* (1990) 221 Cal.App.3d 980, 989 [observing that "being drunk from ingestion of alcohol is a condition subject to common knowledge"] with *Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1614 [noting that probable effects of intoxicants " 'other than alcohol' " generally require expert testimony].)

And in addition to Coronado's memory, evidence of Coronado's drinking was relevant to impeach Coronado's veracity. (Evid. Code, § 780, subds. (e) ["character for honesty or veracity or their opposites" relevant to witness credibility] & (i) ["[t]he existence or nonexistence of any fact testified to by him" relevant to witness credibility].) As related above, Coronado testified that he had a clear memory of his post-working life, claiming that his daily consumption of alcohol was limited to three or four beers in the late afternoon and that he "never drank too much." J.C.'s contrary testimony—that his father drank (1) significantly more, (2) starting significantly earlier in the day, and (3) to deleterious physical effect—tended to show that Coronado was untruthful while testifying. (*See People v. Nunez and Satele* (2013) 57 Cal.4th 1, 27–28 [evidence that witness had bribed someone to testify for defense was admissible when witness denied doing so on cross-examination].) "Although it is improper to elicit otherwise irrelevant testimony on cross-examination merely for the purpose of contradicting it [citation], the

12

trial court has discretion to admit or exclude evidence offered for impeachment on a collateral matter." (*People v. Mayfield* (1997) 14 Cal.4th 668, 748, abrogated on a different point as stated in *People v. Scott* (2015) 61 Cal.4th 363, 391.) And here, Coronado's credibility was paramount to the determination of his guilt, given the absence of eyewitnesses other than S.D., O.D., and Coronado himself.

Finding that the evidence was probative as to Coronado's memory and veracity, we turn to whether the trial court abused its discretion under Evidence Code section 352 by admitting the evidence. To be sure, the lack of expert testimony or direct evidence that Coronado was in fact intoxicated at the time of the offenses limits the probative value of the evidence. But given our deferential standard of review, we cannot conclude that the trial court abused its discretion in determining that the probative value of the evidence was not *substantially outweighed* by the potential for prejudice or the undue consumption of time. Coronado's drinking was not the focus of the trial; the prosecution relied on S.D. and O.D.'s accounts of the events and the use of CSAAS testimony to explain their delayed report. Nor was it the focus of his cross-examination as a whole, as the prosecutor questioned Coronado about a variety of subjects relating to whether S.D. and O.D. were ever alone with him and the contacts between the two families over time; furthermore, Coronado's alcohol consumption was neither unlawful nor suggestive of moral laxity, even as recounted on rebuttal. So relative to the charged offenses, the evidence of Coronado's drinking was not so inflammatory as to risk inducing the jury to disregard the instruction not to consider Coronado's drinking as indicative of bad character. The limiting instruction "eliminated any danger 'of confusing the issues, or of misleading the jury.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.)

On review for abuse of discretion, the question is not whether this court would have reached a different conclusion about the relative probative weight of the evidence in comparison with its potential for prejudice. Our review is to examine whether the trial court, in making its evidentiary decision, exceeded the bounds of reason. While we agree

with Coronado that the evidence had the potential for unfair prejudice, we do not believe that the trial court acted arbitrarily or capriciously in its balancing of prejudice and probative value.[9]

**B.** ***Prosecutorial Misconduct and Ineffective Assistance of Counsel***

Coronado next argues that the prosecutor committed misconduct by mischaracterizing the evidence by alluding that his liver cirrhosis was caused by alcohol use without expert testimony, suggesting that his alcohol use impacted his memory, and vouching for the credibility of the complaining witnesses. Because defense counsel did not object to any of the allegedly improper arguments, Coronado's claims of prosecutorial misconduct have been forfeited. (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*) [defendant must object to prosecutorial misconduct and request admonition to preserve claim of misconduct on appeal].) But we reach the merits given Coronado's alternative claim that his counsel was ineffective in failing to object. Coronado in this appeal has not established deficient performance.

**1.** ***Additional Background***

During closing argument, the prosecutor in part argued that "there is no way these girls were lying," given "how they were testifying, and . . . the lack of motive. People don't make this kind of stuff up. And they have no reason to pin something on their beloved uncle unless it happens to be true." Later, when describing the offenses against O.D., the prosecutor argued that "her probably inebriated uncle, [got] handsy with her a few times."

In discussing the evidence of Coronado's alcohol use, the prosecutor noted that the jury was precluded from using the evidence to find that he was "a bad person, and . . .

---

[9] Coronado on appeal does not challenge the admission of the alcohol evidence under Evidence Code section 1101; thus, any error in the admission of the evidence on this ground has been abandoned. (See *People v. Lemcke* (2021) 11 Cal.5th 644, 654, fn. 3 (*Lemcke*) [noting that claim not briefed is generally assumed to be abandoned].)

14

must [therefore] have done this crime." But the prosecutor argued that the jury could use evidence of Coronado's drinking to "consider . . . his memory" because he "is a very heavy drinker, liver cirrhosis, working on tall boys at 6:00 a.m. in the morning. This is a guy that drinks a lot of alcohol. Consider that for his memory. Consider, you know, the fact that he might not even remember these incidents, . . . [as] someone who is drinking that much." The prosecutor then argued that "common sense and experience" would tell the jurors that "inhibitions are lowered" when drinking which "might explain why, you know, if you can't think well, why would he do this? Well, consider the fact that he is drunk all the time." The prosecutor also argued that they could find Coronado less credible because his testimony about only having three or four beers a day was contradicted by his own testimony that he went into alcohol treatment and then later by J.C. who said Coronado started drinking in the morning and had liver cirrhosis.

### 2. *Legal Principles and Standard of Review*

To prevail on a claim of ineffective assistance of counsel, Coronado must establish both that his counsel's performance was deficient and that the deficiency prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To show deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) And to establish prejudice, a "defendant must show that there is a reasonable probability"— "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

"A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a

fundamentally unfair trial." (*People v. Cook* (2006) 39 Cal.4th 566, 606.) A prosecutor commits misconduct by misstating the evidence or going beyond the record. (*People v. Fayed* (2020) 9 Cal.5th 147, 204 (*Fayed*).) But the prosecution " 'enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom.' " (*Ibid.*) Furthermore, although it is misconduct for the prosecutor to "personally vouch for the credibility of a witness, a prosecutor may properly argue a witness is telling the truth based on the circumstances of the case." (*People v. Boyette* (2002) 29 Cal.4th 381, 433.)

In assessing multiple instances of prosecutorial misconduct, "we consider the cumulative effect of [the] misconduct because the number and gravity of incidents 'raises the strong possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone.' " (*People v. Woods* (2006) 146 Cal.App.4th 106, 117.) We note however, that " '[d]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*Lopez, supra*, 42 Cal.4th at p. 972.)

### 3.    *Analysis*

First, the prosecutor's comments about the credibility of O.D. and S.D. were not misconduct; thus, trial counsel was not ineffective in failing to object to them. The prosecutor, in arguing that O.D. and S.D. had no motive to lie, was inviting reasonable inferences from the evidence, as there was no evidence that O.D. or S.D. had a reason to fabricate their accounts. (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480–481 [argument suggesting that witness had no motive to lie was not misconduct].) Although Coronado claims this amounted to vouching for the witnesses' credibility, the prosecutor did not allude to the existence of extra-record evidence or personal knowledge that O.D. or S.D. were being truthful. "Representation does not become deficient for failing to make meritless objections." (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

16

We acknowledge that the prosecutor's assertion that "[p]eople don't make this kind of stuff up" could in isolation be construed as implying knowledge of evidence that false reporting of "this stuff" is statistically improbable. Such an implication would be improper, particularly when the trial court had precluded the defense from presenting statistical evidence to the contrary. (Cf. *People v. Wilson* (2019) 33 Cal.App.5th 559, 568–571 [statistical evidence about false allegations in child sexual abuse cases is inadmissible to bolster the credibility of child witness].) But in evaluating prosecutorial misconduct in closing argument, we evaluate the comments in context: " '[T]he defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 771–772.) Here, given that the prosecutor linked this statement to O.D.'s and S.D.'s demeanor on the stand and their lack of motive to harm their uncle, we are not persuaded that the jury drew the most damaging inference in this case. Trial counsel was accordingly not ineffective for failing to object to this passing comment.

We also find no ineffective assistance in counsel's failure to object to the prosecutor's characterization of Coronado's drinking as "heavy," his argument that the jury should consider the impact of alcohol on Coronado's memory, and his claim that Coronado was "probably" inebriated and got "handsy" with O.D. a few times. Coronado analogizes his case to *People v. Bolton* (1979) 23 Cal.3d 208. In *Bolton*, the prosecutor hinted twice that if it were not for certain rules of evidence, he would have been able to show that the defendant "was a man with a record of prior convictions or with a propensity for wrongful acts." (*Id.* at p. 212.) In finding this argument improper, the California Supreme Court found that the prosecutor "was attempting to smuggle in by inference claims that could not be argued openly and legally" and that the prosecutor was

17

in effect asking the jury to speculate about evidence that was never presented at trial. (*Ibid.*) The extra-record evidence that Coronado argues the prosecutor alluded to, however, was whether alcohol impacted his memory or that alcohol can reduce inhibitions as there was no testimony on this point.

But unlike *Bolton*, the prosecutor's comments about alcohol were arguments based on inferences in the evidence; particularly, J.C.'s characterization of Coronado's drinking as frequent, Coronado's own testimony that he had previously entered an alcohol treatment program, and O.D.'s reference to Coronado probably drinking before the bedroom incident. (*Fayed*, *supra*, 9 Cal.5th at p. 204.) Nor was the prosecutor's reference to Coronado as having liver cirrhosis misconduct. J.C. testified that he believed that his father suffered from the condition, and that it was his understanding that his father's condition was the result of alcohol abuse.[10] And in referencing the impact of alcohol on inhibitions and memory, the prosecutor did not specifically allude to any evidence that was not admitted at trial; the prosecutor was commenting on matters that are within common experience or knowledge. A prosecutor " ' "may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature." ' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)

---

[10] "Lay opinion testimony is admissible when no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner.' " (*People v. Williams* (1988) 44 Cal.3d 883, 915.) And generally, lay witnesses who are not testifying as an expert are limited to opinions that are either rationally based on the witness's perception or helpful to a clear understanding of the witness's testimony. (Evid. Code, § 801.) But as there was no objection made when J.C. proffered this testimony, any claims of error with respect to J.C.'s testimony on this subject has been forfeited. (Evid. Code, § 353; *Partida*, *supra*, 37 Cal.4th at pp. 433–434.)

We are troubled by the prosecutor's further argument that Coronado's being "drunk all the time" "might explain . . . why [he] would" molest O.D. and S.D. might invite the jury to use evidence of Coronado's drinking as propensity evidence: According to this logic, because Coronado was habitually drunk, it was more likely that he was drunk on the occasions O.D. and S.D. testified he abused them, even though neither sister described him as inebriated; and because this propensity evidence made it more likely he was drunk at the times the girls recounted, he was more likely to have touched them sexually. Generally, "[e]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) But assuming this part of the closing argument constituted misconduct, as noted *ante*, Coronado does not argue on appeal that trial counsel should have invoked Evidence Code section 1101 and the limited purpose for which the evidence was admitted as a basis for objection. Coronado disputes only the evidentiary foundation for the inference as a factual matter— absent either expert testimony about the effects of alcohol or testimony from S.D. or O.D. that Coronado was inebriated during the abuse they described—not the propriety of the inference as a policy matter. (See *People v. Aeschlimann* (1972) 28 Cal.App.3d 460, 473 [legislative purpose of Evid. Code § 1101 "is to assure that a defendant is tried upon the crime charged and is not tried upon an antisocial history"].) Coronado has accordingly abandoned on appeal any claim that trial counsel was ineffective for failing to object to the closing argument as exceeding the limited purpose for which his alcohol use was admitted. (*Lemcke*, *supra*, 11 Cal.5th at p. 654, fn. 3.)

Accordingly, we find that defense counsel's failure to object did not constitute deficient performance on the grounds Coronado argues. (*Strickland*, *supra*, 466 U.S. at p. 688.)

19

## C. *CSAAS Evidence*

Coronado next argues that the trial court erred by admitting expert testimony on CSAAS and that its instruction on the limited use of CSAAS evidence (CALCRIM No. 1193) misleadingly permitted the jury to consider the expert's testimony when evaluating the complaining witnesses' credibility. We find no abuse of discretion in the trial court's admission of evidence and no reversible error in the court's instruction with CALCRIM No. 1193.

### 1. *Admission of CSAAS Evidence*

We review the trial court's admission of evidence, including expert testimony on CSAAS, for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.) California courts have long held that expert testimony concerning CSAAS is admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301; see also *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [limiting the permissible purpose to "showing that the victim's reactions . . . are not inconsistent with having been molested"].)

Coronado argues that CSAAS evidence is unduly prejudicial under Evidence Code section 352. In part, Coronado argues that the victims' behaviors would "[n]ecessarily" fit the CSAAS syndrome because the syndrome "has no fixed characteristics and every conceivable behavior fits the syndrome." Thus, the prosecutor would be able to use the CSAAS evidence to bolster the complaining witnesses' credibility.

But as we have explained, evidence is not unduly prejudicial simply because it is harmful to a defendant's case. (*Doolin*, *supra*, 45 Cal.4th at pp. 438–439.) "[E]ssentially all relevant evidence introduced by the prosecution is likely to be harmful to a defendant's case." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 174 (*Lapenias*).) And here, the prosecution's CSAAS expert Washington testified only generally about the features of CSAAS, describing it chiefly as an educational framework, not a disease or

diagnosis. Washington denied having any knowledge of this case or any opinion of whether O.D. or S.D. had been sexually abused, describing her purpose as simply "to provide information to the jurors so that they can make a more informed decision related to this case." Washington did not express any opinion on whether the behavior or allegations of O.D. and S.D. fit within the CSAAS framework. And the jury was instructed that Washington's testimony on CSAAS evidence was not evidence that Coronado committed a crime against either O.D. or S.D. Coronado offers no basis to disregard the customary presumption that the jury followed this limiting instruction. (See *People v. Cain* (1995) 10 Cal.4th 1, 34.)

Accordingly, the trial court did not abuse its discretion in admitting the expert testimony on CSAAS evidence.

### 2. *CALCRIM No. 1193*

Next, Coronado argues that CALCRIM No. 1193 erroneously permitted the jury to consider CSAAS testimony in determining O.D. and S.C.'s credibility.[11] The jury here was instructed that it could consider the CSAAS evidence "only in deciding whether or not [S.D.'s] conduct and [O.D.'s] conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of each alleged victim." By referencing the victims' "believability," Coronado argues that the instruction lessens the prosecution's burden of proof.

We review a claim of instructional error de novo. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 175.) "The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable

---

[11] Although Coronado did not object to the instruction below, we consider his argument because he essentially claims that the instruction incorrectly stated the law and affected his substantial rights. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326 (*Rivera*).)

Multiple Courts of Appeal have upheld the language of CALCRIM No. 1193 as recited above as accurately informing the jury of the limited use of CSAAS evidence. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*); *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176.) Even assuming without deciding that CALCRIM No. 1193's reference to the victims' believability as a distinct purpose of the instruction creates some ambiguity, we consider it unlikely that the jury here would have applied the instruction in an impermissible manner. (See *Rivera, supra*, 7 Cal.5th at p. 326.) CALCRIM No. 1193 expressly informed the jury that CSAAS evidence was not evidence that Coronado committed the charged crimes. And Washington's own testimony was appropriately limited, as we have explained: She neither rendered an opinion on whether S.D. or O.D. were in fact molested nor suggested that the presence of behaviors matching CSAAS features warranted an inference of past abuse.

In sum, we find no merit in Coronado's assertion that CALCRIM No. 1193's reference to the believability of the victims would have led the jury to believe that it was free to use CSAAS evidence as a diagnostic tool—to extrapolate from O.D.'s and S.D.'s behaviors that Coronado had in fact abused them—rather than to intelligently decide whether O.D.'s and S.D.'s behaviors were self-impeaching. Accordingly, for these same reasons, we find no merit in Coronado's claims that the instruction impermissibly lowered the prosecutor's burden of proof. (See *Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

**D.** *Cumulative Error*

In a supplemental brief, Coronado argues that the cumulative effect of the alleged errors requires reversal of his convictions. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was

22

prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.)  We have assumed error in the context of defense counsel's failure to object during closing argument when the prosecutor argued that Coronado was more likely to have committed the crimes due to his drinking.  But assuming this one error, we found no prejudice.  As there are no other errors to accumulate, we must reject Coronado's claim of cumulative error.

### III.    DISPOSITION

The judgment is affirmed.

_____
LIE, J.

WE CONCUR:


_____
GREENWOOD, P. J.



_____
GROVER, J.




*People v. Coronado*
H050847